THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
BONNIE L. HOBBS
Assistant United States Attorney
National Security Section
(Cal. State Bar # 208525)
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4447
     Facsimile: (213) 894-6436
     E-mail: bonnie.hobbs@usdoj.gov

Attorney for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 09-31-R |
| | ) | CR 09-32-R |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION TO SUPPRESS |
| | ) | EVIDENCE; MEMORANDUM OF POINTS |
| MICHAEL MING ZHANG, | ) | AND AUTHORITIES; DECLARATION OF |
| | ) | SPECIAL AGENT NATHAN N. |
| Defendant. | ) | SURFACE; DECLARATION OF |
| | ) | BONNIE L. HOBBS |
| | ) | |
| | ) | Hearing Date:  May 11, 2009 |
| | ) | Hearing Time:  1:30 p.m. |
| | ) | Location: Courtroom of the |
| | ) | Honorable Manuel Real |
| | ) | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files its opposition to defendant Michael Ming Zhang's motion to suppress evidence. The government's opposition is based on the attached memorandum of points and authorities, the attached declarations and exhibits

thereto, the files and records in this case, and any evidence or argument presented at any hearing on defendant's motion.

Dated: April 27, 2009                    Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


_____
BONNIE L. HOBBS
Assistant United States Attorney

                    Attorneys for Plaintiff
                    United States of America

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

In his motion to suppress, defendant does not contest that the federal search warrant for his residence was issued by United States Magistrate Judge Paul L. Abrams at approximately 5:30 p.m. on May 7, 2008, and that federal agents began the search before 10:00 p.m.  See Defendant's Motion at 3-4, 6.  Defendant proffers no additional facts demonstrating that the search was unreasonable, basing his argument that the search was unreasonable solely on the fact that the search concluded after 10:00 p.m., at approximately 4:00 the next morning, which he alleges was beyond the authorized scope of the warrant, in violation of Federal Rules of Criminal Procedure Rule 41. Defendant alleges that government agents could not have made the required showing for a nighttime warrant, and argues that the execution of the warrant between approximately 9:00 p.m. and 4:00 a.m. violated defendant's Fourth Amendment rights, requiring suppression of evidence obtained during the search.

As set forth below, there was no violation of the terms of the warrant in this case because the search was commenced in the "daytime" as defined by Rule 41, that is, prior to 10:00 p.m. – a fact that is undisputed.  Further, as demonstrated by the facts contained in the Declaration of Special Agent Nathan Surface, filed concurrently herewith, the search made after 10:00 p.m. was a reasonable continuation of the search initiated prior to that time.  A search beginning before 10:00 p.m. and reasonably continuing thereafter does not violate Rule 41, and defendant has demonstrated no prejudice resulting from continuation of the

1

search after 10:00 p.m.   Therefore, defendant's motion for suppression of the evidence seized during the search should be denied.

### II. BACKGROUND

On May 7, 2008, federal agents obtained a search warrant to search the premises located at 12225 Richfield Drive, Rancho Cucamonga, California 91739 (the "Subject Premises"). Defendant's Motion, Exh. B.  The warrant was issued by United States Magistrate Judge Paul L. Abrams at 5:30 p.m.  Id.  The warrant commanded Special Agents of the FBI or any other authorized agents to search the Subject Premises on or before ten days after the issuance of the warrant, during the "daytime-6:00 A.M. to 10:00 P.M."  Id.  Federal agents applied for the warrant after a state search warrant had been served on the Subject Premises earlier the same day.  Defendant's Motion, Exh. A.  The federal warrant sought evidence of violations of United States export laws and laws relating to smuggling and trafficking in counterfeit goods.  Defendant's Motion, Exh. B.  Specifically, the federal warrant listed as items to be seized, among other things, counterfeit electronic components and authentic electronic components that may have been used as samples for the manufacture of counterfeit components, as well as labels and packaging for counterfeit components.  Id.[1]

After obtaining the federal warrant at approximately 5:30 p.m., agents drove with the warrant from downtown Los Angeles to the Subject Premises, in Rancho Cucamonga.  Declaration of

_____

[1] The state search warrant also sought counterfeit items, primarily "Sony" products.  See Declaration of Bonnie L. Hobbs, filed concurrently herewith, Exh. A.

Special Agent Nathan N. Surface (hereinafter referred to as the "Surface Declararation") at ¶ 3.  The agents arrived in Rancho Cucamonga with the warrant at approximately 7:00 p.m.  Id.  After they arrived with the warrant, the members of the search team read the warrant and prepared to execute it.  Id.  The search team, comprised of approximately ten FBI agents and agents from four other federal agencies, was assembled at approximately 8:50 p.m.  Id. at ¶¶ 2, 4.  While other agents were interviewing defendant, the search team waited outside the Subject Premises, and entered the Subject Premises at approximately 9:25 p.m. to begin the search.  Id. at ¶ 4.

The Subject Premises included a house and two attached garages.  Defendant's Motion, Exh. A.  The Subject Premises also included an office, a room containing packaging materials, and inventory for defendant's business, comprised primarily of various types of electronic components.  Surface Decl. at ¶ 6. Electronic components were stored in the single-car garage and the room containing the packaging materials.  Id.

Defendant, his wife, and their two young children were present during the search.  Id. at ¶ 5.  Throughout the course of the search, the children were permitted to remain in their bedroom, and defendant and his wife were permitted to attend to the children and to their personal needs while accompanied by an agent.  Id.

The agents spent the majority of time during the search in the garage where the electronic components were stored, or in efforts to organize, package, and transport the electronic components.  Id. at ¶ 7.  In the garage, agents found a

3

voluminous quantity of electronic components, numbering in the thousands, on shelves lining all four walls of the garage. <u>Id.</u> at ¶¶ 6, 7.  Most of the components were loose, so the agents then began the process of sorting through the components to determine whether they were within the scope of items to be seized pursuant to the warrant, and upon making such determination, they then photographed, organized and packaged the components for transportation to an evidence facility. <u>Id.</u> at ¶ 7.  The quantity of seized evidence exceeded the capacity of the vehicles that the agents had driven to the premises, so agents had to make arrangements for additional means of transportation of the evidence. <u>Id.</u>  Because of the large volume of evidence, the agents began transporting the evidence off of the Subject Premises after it was packaged and logged, and continued to remove evidence from the Subject Premises as they continued the search. <u>Id.</u>  The evidence recovery log indicates that the agents recovered approximately one hundred boxes of microchips from the Subject Premises, containing thousands of components. <u>Id.</u> at ¶ 8 and Exh. A.  Agents concluded the search at approximately 4:00 a.m., immediately after the last boxes of inventory had been removed from the Subject Premises. <u>Id.</u> at ¶ 9.

**III.  ARGUMENT**

A.    <u>A Search that Commences Before 10:00 p.m. and Continues After 10:00 p.m. Does Not Violate Rule 41</u>

Defendant argues that the search of his residence, because it continued after 10:00 p.m., violated Rule 41's prohibition against unauthorized nighttime searches and was unreasonable under the Fourth Amendment, requiring suppression of the seized

4

evidence. Defendant's Motion at 6, 7. While the government has not found case law in the Ninth Circuit directly addressing this issue, defendant's argument is against prevailing case law in other circuits holding that a search that lawfully begins in the daytime may continue into the night. Therefore, defendant's motion to suppress the evidence obtained during the search should be denied.

The Fourth Amendment prohibits "unreasonable searches and seizures." While defendant is correct that nighttime searches of private homes raise special concerns relating to invasion of privacy, see Jones v. United States, 357 U.S. 493, 498-99 (1958) (observing that "it is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home that occurred in this instance"), nighttime searches are not per se unreasonable. United States v. McCarty, 475 F.3d 39, 43 (1st Cir. 2007). Courts apply a traditional reasonableness test to the search, in which the court assesses the totality of the circumstances, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. (quoting United States v. Cofield, 391 F.3d 334, 336 (1st Cir. 2004)). A search that begins during the daytime, but continues through the nighttime, is not necessarily unreasonable. Id. at 44 (citing United States v. Young, 877 F.2d 1099, 1105 (1st Cir. 1989)).

Federal Rules of Criminal Procedure Rule 41 provides that a warrant to search for and seize property issued thereunder must command the officer to execute the warrant during the daytime,

unless the judge for good cause expressly authorizes execution at another time. Fed. R. Crim. P. 41(e)(2)(A)(ii). "Daytime" is defined as the hours between 6:00 a.m. and 10:00 p.m. Fed. R. Crim. P. 41(a)(2)(B). Courts have held that a search that begins in the "daytime" pursuant to Rule 41, that is, before 10:00 p.m., and continues through the nighttime, is not unreasonable, and in such circumstances have refused to suppress evidence seized after 10:00 p.m. See McCarty, 475 F.3d at 44 (holding that search that continued until 10:35 p.m. was not unreasonable and concluding that district court was correct to have denied defendant's motion to suppress evidence collected from his apartment); United States v. Squillacote, 221 F.3d 542, 556 (4th Cir. 2000) (stating that because search was commenced in daytime, federal agents reasonably could have believed that it was proper to continue search into night); United States v. Dickerson, 195 F.3d 1183, 1187 (10th Cir. 1999) (finding that search where police arrived at 9:47 p.m. and secured defendant and other individuals outside the house in less than a minute was reasonable); Young, 877 F.2d at 1105 (stating that court was aware of no legal reason why search could not continue at night or of anything in Rule 41 or Constitution that forbids continuing search at night, at least when doing so is reasonable); United States v. Schoenheit, 856 F.2d 74, 77 (8th Cir. 1988) (holding that when forty-five minute delay due to detective wandering too close to house prevented warrant from being executed before 10:00 p.m., suppression of evidence was not warranted where defendant was not awakened in the middle of the night while in bed and answered door of own volition); United States v. Burgard, 551 F.2d 190, 193 (8th Cir.

6

1977) (holding that searches which began during daytime and continued into night have been held not to violate Rule 41 and seeing no merit in suppressing fruits of search simply because search was still in progress at 10:00 p.m. and was not completed before 11:00 p.m.); United States v. Woodring, 444 F.2d 749, 751 (9th Cir. 1971) (holding that requirement of daylight service of warrant, which did not arrive at premises until hour and a half after sunset, was sufficiently satisfied by fact that officers initiated search during daylight and left copy of warrant on premises during course of search, and citing United States v. Joseph, 278 F.2d 504 (3d Cir. 1960)); Joseph, 278 F.2d at 505 (holding that conduct of searching officers was within authorization of warrant where actual searching began at 4:00 in afternoon and was not completed until after 10:00 at night).

The cases cited by defendant in support of his argument are easily distinguished from this case. In United States v. Raidl, 250 F. Supp. 278 (N.D. Ohio 1965), the warrant at issue, in contrast to the warrant to search the Subject Premises in this case, was a nighttime warrant. The district court in Raidl found that there was no basis in law for a nighttime warrant, and the fact that the warrant was executed before nightfall did not render valid an otherwise invalid warrant. In United States v. Boyance, 398 F.2d 896 (3d Cir. 1968), the judge issued a daytime search warrant at 1:00 a.m., and officers made entry at 2:30 a.m., in violation of the clear terms of the warrant. Finally, in United States v. Merritt, 293 F.2d 742 (3d Cir. 1961), the court found that a daytime search warrant for narcotics had not been executed until nighttime, and that the nighttime execution

7

was not justified by the fact that the United States Commissioner who issued the warrant was empowered under the Narcotic Control Act to provide for service at any time of the day or night, when he had not done so in that case.

In this case, as set forth above, there is no dispute that the federal warrant was a daytime warrant issued pursuant to the terms of Rule 41; that the time frame set for execution on the face of the warrant was 6:00 a.m. to 10:00 p.m.; and that the search began prior to 10:00 p.m. As demonstrated by the case law set forth above, a search that begins before 10:00 p.m. and continues thereafter is not necessarily unreasonable, and does not necessarily violate Rule 41. Therefore, defendant's argument that the search of the Subject Premises in this case violated Rule 41 solely because it continued past 10:00 p.m. is without merit, and defendant's motion to suppress the evidence obtained during the search on that basis should be denied.

B. **The Search of the Subject Premises After 10:00 p.m. was a Reasonable Continuation of the Search Before 10:00 p.m., and Does Not Violate the Fourth Amendment**

As set forth above, a search conducted pursuant to a search warrant issued pursuant to Rule 41 and begun prior to 10:00 p.m. is not necessarily unreasonable solely because it continues past 10:00 p.m. As set forth above, courts have applied the traditional reasonableness test to such searches, in which the court assesses the totality of the circumstances, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." McCarty, 475 F.3d at 43 (quoting Cofield, 391 F.3d at 336). The reasonableness inquiry for such

8

searches can also be framed as an inquiry as to whether the search after 10:00 p.m. is a reasonable continuation of the search begun prior to that time. Joseph, 278 F.2d at 505 (holding that evidence did not show that search made after nightfall was more than reasonable continuation of search which began in afternoon). Some of the factors courts have considered in conducting a reasonableness inquiry for such searches include whether the defendant was awakened in the middle of the night while in bed and answered the door of his own volition, Schoenheit, 856 F.2d at 77 and McCarty, 475 F.2d at 44; the amount of contraband found, the difficulties of finding it, and evidence of special inconvenience to residents, Young, 877 F.2d at 1105; the degree of freedom allowed the defendant during the search and whether the search was conducted in a professional manner, McCarty, 475 F.2d at 44; and the degree of intrusion and interference with the property, United States v. Gagnon, 635 F.2d 766, 769 (10th Cir. 1981). When examined under the facts and circumstances of this case, all of these factors demonstrate that the continuation of the search of the Subject Premises after 10:00 p.m. was reasonable.

As Special Agent Surface, one of the team leaders for the search of the Subject Premises, sets forth in his declaration, agents arrived with the search warrant at approximately 7:00 p.m., and interviewed defendant prior to the entry of the search team at approximately 9:25 p.m. Surface Decl. At ¶ 3-4. Thus, defendant was not roused out of bed for the search. Further, defendant and his wife were permitted to attend to their needs and to their two children throughout the course of the search,

and agents searched the children's bedroom and surrounding areas first, and permitted the children to remain in their room throughout the night. Id. at ¶ 5. The majority of the agents' time during the search was spent in the garage where the largest volume of inventory of electronic components was found, and in efforts to organize and package the components. Id. at ¶ 7. Defendant has made no allegations of any special inconvenience resulting from the timing of the search, and indeed, the facts set forth in Special Agent Surface's affidavit lead to the same conclusion reached by the magistrate in Schoenheit, who observed that "it is difficult to imagine that a search in broad daylight would have been any less abrasive than was this search." Schoenheit, 856 F.2d at 77. Further, given the voluminous quantity of electronic components found at the Subject Premises, the difficulties of sorting, packaging, and transporting such a large quantity of evidence, and the agents' efforts to begin moving evidence off of the Subject Premises even as they were continuing to search in an effort to shorten the total time necessary to remove all of the evidence, the agents' conduct in continuing the search until approximately 4:00 a.m., when all of the evidence had been removed, was motivated, and indeed mandated, by considerations of practicality, thoroughness, and an obligation to properly document and preserve all evidence seized. Therefore, the totality of the circumstances in this case indicates that a continuation of the search of the Subject Premises beyond 10:00 p.m. was reasonable and thus did not violate the Fourth Amendment, and defendant's motion to suppress the evidence obtained during the search should be denied.

10

## IV. CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny defendant's motion to suppress.

## DECLARATION OF SPECIAL AGENT NATHAN N. SURFACE

I, Nathan N. Surface, do hereby declare and state:

1.    I have been a Special Agent with the Los Angeles Field Office of the Federal Bureau of Investigation ("FBI") for more than five years.

2.    On May 7, 2008, at approximately 5:30 p.m., the FBI obtained a search warrant for the premises located at 12225 Richfield Drive, Rancho Cucamonga, California 91739 (the "Subject Premises"). The Subject Premises was the residence of Michael Ming Zhang, from which the FBI's investigation had revealed he also ran his business, J.J. Electronics, and consisted of a house and two attached garages. I was one of the team leaders for the search. The search team consisted of approximately ten Special Agents of the FBI, and also included agents from other federal agencies, including the Defense Criminal Investigative Service, the U.S. Postal Inspection Service, the Department of Commerce, and Immigration and Customs Enforcement.

3.    The agents who obtained the warrant drove the warrant from downtown Los Angeles to the Subject Premises in Rancho Cucamonga. They arrived in Rancho Cucamonga with the warrant at approximately 7:00 p.m. After they arrived with the warrant, all of the agents on the search team read the warrant and prepared to execute it.

4.    At approximately 8:50 p.m., the search team assembled outside the Subject Premises. We waited outside while other agents were interviewing Michael Ming Zhang, and at approximately 9:25, we entered the residence, presented the search warrant to Mr. Zhang, and began the search.

1

5.    Michael Ming Zhang, his wife, and their young twin sons were present during the search.  Agents searched the children's bedroom and the surrounding rooms first, and the children were permitted to remain in their room throughout the course of the search.  As needed throughout the entire search, Mrs. Zhang was permitted to attend to the children or tend to her personal needs while accompanied by an agent.  Mr. Zhang remained seated on a couch in the living room during most of the search, and was also permitted to attend to the children and to his personal needs while accompanied by an agent.

6.    The premises included an office, a single garage containing inventory of electronic components, and a room containing packaging materials and additional electronic components, among other rooms.  The garage contained shelves along all four walls that contained thousands of electronic components.  The packaging room contained additional components and a large quantity of packaging materials for the components. The office contained computers and file cabinets full of business documents.

7.    The majority of our time during the search was spent in the garage or in efforts to organize and package components taken out of the garage.  First, we sorted through the components to determine whether they were within the scope of the warrant, and photographed the evidence.  Then we attempted to organize the components, which numbered in the thousands, and determine how best to package the components for transportation to an evidence facility.  Many of the components were loose, in that they were not packaged in boxes or other containers.  Due to the vast

amount of components, we had to obtain additional boxes and other packaging material in which to transport the components. The quantity of components exceeded the capacity of the vehicles we had driven to the premises, so we located additional transportation for the evidence. We began transporting evidence off of the Subject Premises once it was packaged and logged. While the initial transportation of evidence took place, the search within the Subject Premises continued. Two vans and a truck made several trips back and forth from the Subject Premises, so that we could leave the Subject Premises as soon as possible.

8.   I assisted in preparing the evidence recovery log, a true and correct copy of which is attached hereto as Exhibit A. During the search, as indicated on the log, we recovered approximately one hundred boxes of microchips from the Subject Premises, containing thousands of electronic components.

9.   We concluded the search at approximately 4:00 a.m., immediately after all of the evidence, including all of the electronic components, had been transported from the Subject Premises.

I declare under penalty of perjury that the foregoing is true and correct, and that I have executed this declaration on April 27, 2009.

Special Agent Nathan N. Surface

3

EXHIBIT A

MZ1453

# EVIDENCE RECOVERY LOG

COPY

LOCATION 12225 Richfield Dr. Rancho Cucamonga, CA
DATE 02/07/2008
CASE IDENTIFIER ████████████
PREPARER/ASSISTANTS Cathy Lass
Nathan Surface
John Pae

COPY

PERSONNEL _____

Case 2:09-cr-00031-R Document 52 Filed 04/27/09 Page 17 of 33 Page ID #:167

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING Direct—D Indirect—I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 1 | JJ Electronics invoices | AA white bookshelf | Pae | N | I | plastic | request return in 2-3 days |
| (2) | Homeowner, financial docs, tax returns, articles of incorporation | V dresser | | N | I | box | |
| 3 | wire transfer docs, media storage devices | V dresser, top | | N | I | plastic | |
| 4 | financial docs, Chinese, US passports PRA cards | V dresser drawer | | N | I | plastic | |
| 5 | US Postal Service mailing labels | O cabinets | | Y | I | plastic | |
| 6 | banking documents, invoices | O cabinets | | Y | I | box | |
| 7 | binder of export training, importing documents | O cabinets | | Y | I | plastic | |
| 8 | customer invoices | AA grey cabinet "Misc Customers A-Z" | | | D | | |
| 9 | customer invoices | AA grey cabinet "old customers A-J" | | | D | | |
| 10 | customer invoices | AA grey cabinet "old customers K-Z" | | | D | | |
| 11 | invoices | AA wood shelf | | | I | box | |
| 12 | invoices | AA wood shelf | | | I | box | |
| 13 | microchips | B Unit 1 shelf 1+2 | top + 1 surface | | I | box | |
| 14 | microchips | B Unit 1 shelf 2 | | | I | box | |
| 15 | microchips | B Unit 1 shelf 3 | | | I | box | |
| 16 | microchips | B Unit 1 shelf 4 | | | I | box | |
| 17 | microchips | B Unit 1 shelf 5 | | | I | box | |
| 18 | microchips | B Unit 1 shelf 6 | | | I | box | |

LOCATION_____
DATE_____
CASE IDENTIFIER_____
PREPARER/ASSISTANTS_____

PERSONNEL_____

Case 2:09-cr-00031-R   Document 52   Filed 04/27/09   Page 18 of 33   Page ID #:168

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING Direct—D Indirect—I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 19 | microchips | B Unit 1 Shelf 7+8 | Surface | | I | box | |
| 20 | microchips | B Unit 1 shelf 8 | | | I | box | |
| 21 | microchips | B Unit 1 shelf 8+9 | | | I | box | |
| 22 | microchips | B Unit 1 shelf 9 | | | I | box | |
| 23 | microchips | B Unit 2 shelf 1 | | | I | box | |
| 24 | microchips | B Unit 2 shelf 1+2 | | | I | box | |
| 25 | microchips | B Unit 2 shelf 2 | | | I | box | |
| 26 | | B Unit 2 shelf 3 | | | | | |
| 27 ⟹ | 5 checks + (valuables) | AA desk | | | I | plastic | |
| 28 | invoices | AA | Pae | | I | box | |
| 29 | rolodex, financial documents | AA | Pae | | I | box | |
| 30 | utility bills, tax info credit card | AA | | | D | | |
| 31 | college info, mortgage, bank statements UPS program commissions, BOA | AA | | | D | | |
| 32 | microchips | B Unit 2 shelf 4 | Surface | | I | box | |
| 33 | microchips | B Unit 2 shelf 4+5 | | | I | box | |
| 34 | microchips | B Unit 2 shelf 5+6 | | | I | box | |
| 35 | microchips | B Unit 2 shelf 6 | | | I | box | |
| 36 | microchips | B Unit 2 shelf 6 | | | I | box | |
| 37 | microchips | B Unit 2 shelf 6+7 | | | I | box | |
| 38 | microchips | B Unit 2 shelf 7 | | | I | box | |
| 39 | microchips | B Unit 2 shelf 8 | | | I | box | |
| 40 | microchips | B Unit 2 shelf 8 | | | I | box | |
| 41 | microchips | B Unit 2 shelf 9 + Unit 3 shelf 1 | | | I | box | |
| 42 | microchips | B Unit 3 shelf 1 | | | I | box | |

MZ1454

Case 2:09-cr-00034-R   Document 52   Filed 04/27/09   Page 19 of 33   Page ID #:169

# EVIDENCE RECOVERY LOG

LOCATION_____
DATE_____
CASE IDENTIFIER_____
PREPARER/ASSISTANTS_____

PERSONNEL_____

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING Direct—D Indirect—I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 43 | microchips | B Unit 3 shelf 1+2 | Surface | | | | |
| 44 | microchips | B Unit 3 shelf 2 | | | I | box | |
| 45 | micro chips | B Unit 3 shelf 2+3 | | | I | box | |
| 46 | microchips | B Unit 3 shelf 3 | | | I | box | |
| 47 | microchips | B Unit 3 shelf 3+5 | | | I | box | |
| 48 | microchips | B Unit 3 shelf 4 | | | I | box | |
| 49 | micro chips | B Unit 3 shelf 4 | | | I | box | |
| 50 | micro chips | B Unit 3 shelf 5 | | | I | box | |
| 51 | micro chips | B Unit 3 shelf 5+6 | | | I | box | |
| 52 | micro chips | B Unit 3 shelf 5+6 | | | I | box | |
| 53 | microchips | B Unit 3 shelf 6+7+8+9 | | | I | box | |
| (54) | microchips | B Unit 3 shelf 6 | | | I | box | |
| 55 | microchips | B Unit 3 shelf 7 | | | D | | |
| 56 | microchips | B Unit 3 shelf 7 | | | D | | |
| 57 | micro chips | B Unit 3 shelf 7 | | | D | | |
| 58 | microchips | B Unit 3 shelf 7 | | | D | | |
| 59 | microchips | B Unit 3 shelf 8 | | | D | | |
| 59 | micro chips | B Unit 3 shelf 8 | | | D | | |
| 60 | microchips | B Unit 3 shelf 9 | | | D | | |
| 61 | micro chips | B Unit 4 top+shelf 1 | | | I | box | |
| 62 | microchips | B Unit 4 shelf 1, 2, 3 | | | I | box | |
| 63 | microchips | B Unit 4 shelf 3, 4, 5, 6 | | | I | box | |
| 64 | Microchips | B Unit 4 shelf 6, 7, 8, 9 | | | I | box | |
| 65 | Microchips | B Unit 4 shelf 9, Unit 5 shelf 2, | | | I | box | |
| 66 | Microchips | B Unit 5 shelf 4, 5; Unit 6 shelf 1 | | | I | box | |
| 67 | microchips | B Unit 6 shelf 1, 2, 3 | | | I | box | |
| 68 | microchips | B Unit 6 shelf 4, 5, 6 | | | I | box | |
| 69 | microchips | B Unit 6 shelf 6, 7 | | | I | box | |
| 70 | microchips | B Unit 6 shelf 8, 9+ Unit 7 top | | | I | box | |
| 71 | microchips | B Unit 7 shelf 1, top, 2, 3, 4, 5 | | | I | box | |
| 72 | microchips | B Unit 7 shelf 4, 5, 6 | | | I | box | |

MZ1455

Case 2:09-cr-00031-R   Document 52   Filed 04/27/09   Page 20 of 33   Page ID #:170

LOCATION _____
DATE _____
CASE IDENTIFIER _____
PREPARER/ASSISTANTS _____

PERSONNEL _____

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING. Direct—D Indirect—I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 73 | microchips | B Unit 7, shelf 7,8,9 and top | Surface | | I | box | |
| 74 | microchips | B Unit 8, shelf 1,2 | ↓ | | I | box | |
| 75 | shipping invoices | AA bookcase | Pae | | I | box | |
| 76 | invoices, company contacts | AA top of file cabinet | | | I | box | |
| 77 | emails, invoices | AA desktop | | | I | box | |
| 78 | invoices | AA rolling cabinet file | | | I | box | |
| 79 | invoices | AA grey cabinet "Current Customers L-Z" | | | D | | |
| 80 | invoices | AA grey cabinet "Current Customers A-K" | | | D | | |
| 81 | invoices | AA grey cabinet "V" | | | D | | |
| 82 | invoices | AA grey cabinet | | | D | | |
| 83 | UPS shipping invoices Fed Ex statements | AA | | | I | box | |
| 84 | invoices | AA grey cabinet | | | D | | |
| 85 | "MTD 20P quantity 2,500" | D long table | | | I | plastic | |
| 86 | shipping sleeves for chips | D ping pong table D2 | | | I | box | |
| 87 | packing material | D, D1, D2, D3, D4 | | | I | box | |
| 88 | varins chips – Xilix | D D3 | | | I | box | |
| 89 | chips | D3 | | | D | box | |
| 90 | chips | D 3 | | | I | box | |
| 91 | empty shipping boxes | D2 | | | I | box | |
| 92 | yellow warning tape | F | | | I | box | |
| 93 | microchips | B Unit 8, Shelf 2,3 | Surface | | I | box | |
| 94 | microchips | B Unit 8, Shelf 3,4, 5, and 6 | ↓ | | I | box | |

MZ1456

LOCATION _____
DATE _____
CASE IDENTIFIER _____
PREPARER/ASSISTANTS _____

PERSONNEL _____

Case 2:09-cr-00031-R    Document 52    Filed 04/27/09    Page 21 of 33    Page ID #:171

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING Direct—D Indirect—I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 95 | microchips | B Unit 8, shelf 6,7,8 | Surface | | I | box | |
| 96 | microchips | B Unit 8, Shelf 7,8,9 and | | | I | box | |
| | | B Unit 9, Shelf 1,2 | | | | | |
| 97 | microchips | B Unit 9, shelf 3,4 and 5,6,7,8,9 | | | I | box | |
| 98 | Atmel chips | N | Pae | | D | box | |
| 99 | Atmel chips | N | | | D | box | |
| 100 | Atmel Chips | N | | | D | box | |
| 101 | microchips "Graftec" | N | | | D | box | |
| 102 | computer chips | N | | | I | box | |
| 103 | "Global Express Mail" Package chips | N | | | D | box | |
| 104 | "Kamei" peripherals | N | | | D | box | |
| 105 | "Office Depot" box w/ chips | N | | | D | box | |
| 106 | "S4 EB" box w/ chips | N | | | D | box | |
| 107 | United Data tech | N | | | D | box | |
| 108 | "B TS 412" chips | N | | | D | box | |
| 109 | "TC 75 W 5" chips | N | | | D | box | |
| 110 | "Dell Direct" chips | N | | | D | box | |
| 111 | "Selectroniks" chips | N | | | D | box | |
| 112 | microchips | N | | | I | box | |
| 113 | microchips | B Unit 9 Shelf 8,9 and Unit 10 top | Surface | | I | box | |
| 114 | microchips | B Unit 9, Shelf 8 | | | I | box | |
| 115 | | B Unit 10, Shelf 1 | | | D | box | |
| 116 | | B Unit 10, Shelf 1 | | | I | box | |
| 117 | | B Unit 10, Shelf 4 | | | I | box | |
| 118 | | B Unit 10, Shelf 5 | | | I | box | |

MZ1457

Case 2:09-cr-00033-R    Document 52    Filed 04/27/09    Page 22 of 33    Page ID #:172

LOCATION_____

DATE_____

CASE IDENTIFIER_____

PREPARER/ASSISTANTS_____

PERSONNEL_____

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING Direct—D Indirect—I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 119 | microchips | B Unit 10, Shelf 7 | Surface | | | | |
| 120 | | B Unit 10, Shelf 8 | | | I | box | |
| 121 | | B Unit 10, Shelf 8 | | | I | box | |
| 122 | | B Unit 10, Shelf 9 | | | D | box | |
| see for | evidence recovery log items 123 – 128 | | | | I | box | |

MZ1458

Case 2:09-cr-00031-R   Document 52   Filed 04/27/09   Page 23 of 33   Page ID #:173

MZ1459

LOCATION 12225 Richfield Dr., Rancho Cucamonga, CA.
DATE 05/07/2008
CASE IDENTIFIER 2007-LA-248532
PREPARER/ASSISTANTS

PERSONNEL

| ITEM # | DESCRIPTION | WHERE FOUND | RECOVERED BY | PHOTO | MARKING Direct—D Indirect—I | PACKAGING METHOD | MISCELLANEOUS COMMENTS |
|---|---|---|---|---|---|---|---|
| 123 | Black Computer, Generic Face | Office -SW corner (Rm AA) | Kempf | | D | | |
| 124 | Black Computer, "A Case Open" Label | Office - N side (Rm AA) | | | D | | |
| 125 | Black Computer, Silver Face | Office - SE corner (Rm AA) | | | D | | |
| 126 | White Computer, Intel Sticker | Office- SE Corner (Rm AA) | | | D | | |
| 127 | Toshiba Satellite laptop | Office- N wall (Rm AA) | | | D | | |
| 128 | White Computer w/ Zip Drive | Office-Middle (Rm AA) | | | D | | |



MZ1460



MZ1461

## DECLARATION OF BONNIE L. HOBBS

I, Bonnie L. Hobbs, declare as follows:

1.    I am an Assistant United States Attorney in the Central District of California.  In that capacity, I represent the government in <u>United States v. Michael Ming Zhang, et al.</u>, No. CR 09-31-R, and <u>United States v. Michael Ming Zhang</u>, No. CR 09-32-R.  I make this declaration in support of the Government's Opposition to Defendant's Motion to Suppress Evidence.

2.    Attached hereto as Exhibit A is a true and correct copy of the Search Warrant issued by the Honorable Brett London, Judge of the Superior Court, County of Orange, on May 7, 2008, for the premises located at 12225 Richfield Drive, Rancho Cucamonga, California 91739.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: April 27, 2009

BONNIE L. HOBBS

4

STATE OF CALIFORNIA - COUNTY OF ORANGE

# SEARCH WARRANT AND AFFIDAVIT
## (AFFIDAVIT)

FILED
08 MAY 16 AM 9: 29
ALAN SLATER, CLERK OF THE COURT
BY _____ PERLIN

__Investigator Brian Sims__ : declares under penalty of perjury that the facts expressed by him/her in the
(Name of Affiant)

attached and incorporated **Statement of Probable Cause** are true and that based thereon he/she has probable cause to believe and does believe that the articles, property, and persons described below are lawfully seizable pursuant to Penal Code Section 1524, as indicated below, and are now located at the locations set forth below. Wherefore, affiant requests that this Search Warrant be issued.

_____ #3470 , NIGHT SEARCH REQUESTED:   YES [  ]   NO [ X ]
(Signature of Affiant)

# (SEARCH WARRANT)

THE PEOPLE OF THE STATE OF CALIFORNIA TO ANY SHERIFF, POLICEMAN OR PEACE OFFICER IN THE COUNTY OF ORANGE: proof by affidavit, under penalty of perjury, having been made before me by _____ **Investigator Brian Sims** _____
(Name of Affiant)

that there is probable cause to believe that the property or person described herein may be found at the locations set forth herein and that it is lawfully seizable pursuant to Penal Code Section 1524 as indicated below by "x"(s) in that it:

_____ was stolen or embezzled.

_____ was used as the means of committing a felony.

__X__ is possessed by a person with the intent to use it as means of committing a public offense or is possessed by another to whom he or she may have delivered it for the purpose of concealing it or preventing its discovery.

__X__ tends to show that a felony has been committed or that a particular person has committed a felony.

_____ tends to show that sexual exploitation of a child, in violation of Penal Code Section 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Section 311.11, has occurred or is occurring.

_____ there is a warrant to arrest the person.

_____ this warrant is also sought pursuant to California Penal Code section 1524.2 where upon a provider of electronic communications service or remote computing service has records or evidence, as specified in Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery.

YOU ARE THEREFORE COMMANDED TO SEARCH:   (Premises, vehicles, persons)
**12225 Richfield Dr., Richfield Dr., Rancho Cucamonga California 91739 – See Attachment 1**

FOR THE FOLLOWING PROPERTY OR PERSONS:
**See Attachment #2**

AND TO SEIZE IT/ THEM IF FOUND and bring it/ them forthwith before me, or this court, at the courthouse of this court. This **Search Warrant** and **Affidavit** and attached and incorporated **Statement of Probable Cause** were sworn to as true under penalty of perjury and subscribed before me on (date) _____ 5/7/08 _____ , at  11:15 A.M. / P.M. Wherefore, I find probable cause for the issuance of this Search Warrant and do issue it.

KNOCK-NOTICE EXCUSED: [   ]
NIGHT SEARCH APPROVED: YES [   ] NO [ X ]

_____
(Signature of Magistrate)   BRETT LONDON
Judge of the **Superior** Court, _____ Justice Center, Dept./Div. 8
OCDA: jps-ltmf:\forms\sw-af1.597



EXHIBIT A

SONY0241

## ATTACHMENT 1
### (Description of Locations)

**#1** – 12225 Richfield Dr., is located in the City of Rancho Cucamonga, County of San Bernardino; State of California with a zip code of 91739 and is further described as: 2 story single family residence with olive green stucco, brown tile roof and tan wooden trim. The front doors are made of wood and glass that face to the North. The numbers "12225" are displayed on a plastic illuminated placard next to the garage doors.

SONY0242

## ATTACHMENT 2
### (For the following property)

Indices of occupancy for the business and of the residents named including, but not limited to any personal property, mail addressed to the residence, utility billings for the residence or any other receipts or documents tending to show dominion and control of the residence.

Your affiant seeks permission to video tape and/or still photograph the residence, vehicle(s) and subject(s) named in this search warrant for the documentation and evidence.

All unauthorized items such as *Sony* products which reproduce, copy, counterfeit, imitate, replicate or bear counterfeit trademarks, trade names, logos or designs, such as, patches, memory sticks, digital security items, cameras, MP3 digital players, flash drives, external data hard drives, hardware or any other unauthorized items which imitate or bear unauthorized replications of the trademarks, names, logos or designs of items including but not limited to *Sony*.

Any sales, supplier and/or customer journals, ledgers, sales slips, invoices, purchase orders, inventory control documents, bank records, catalogs, recordings of any type whatsoever, client lists, telephone lists, telephone bills, cellular telephone bills, shipping documents, packaging materials, labels, records of shipments made by common carriers and all other business records and documents believed to concern the manufacture, distribution, importation, purchase, advertising, sale or offering for sale of the aforementioned infringing or unauthorized products.

Genuine products such as *Sony* products/manufacturers when found in areas, locations or situations where it would suggest that these products were utilized in the design of counterfeit products or for comparison with the counterfeit product(s).

Any manufacturing equipment or means of production which show a means of manufacture of counterfeit items, when found at the Search Warrant locations.

All electronic data processing and storage devices, computers and computer systems, such as central processing units, internal and peripheral

SONY0243

storage devices such as fixed disks, internal and external hard drives, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, dongles, encryption keys, personal data assistants (PDA's) or other memory storage devices; and any/all peripheral input/output devices such as keyboards, printers, video display monitors, optical readers and related communication devices such as modems, associated telephone sets, speed dialers, and/or other controlling devices, plotters, software to run programs, connecting cables and plugs, peripherals such as joysticks, mouses, or other input devices, scanners, writing pads, manuals, connecting switches, telephones and telephone cables, and interface devices; system documentation, operating logs and documentation, software and instructional manuals. Computing or data processing software, stored on any type of medium such as: hard disks, floppy disks, CD-R's, CD-RW's, DVD's, cassette tapes, or other permanent or transient storage medium.

Any records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic calendar\address books" calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records.

Any written or computer communication in printed or stored medium such as E-Mail, eBay transactions and Chat Logs whether in active files, deleted files or unallocated space on the hard drive, floppy drive or any data storage media.

Search of all of the above items is for files, data, images, software, operating systems, deleted files, altered files, system configurations, drive and disk configurations, date and time, and unallocated and slack space, for evidence.

With respect to computer systems and any items listed above found during the execution with this Search Warrant, the searching Peace Officers are authorized to seize and book said computer systems and any items listed above and transfer them to a Law Enforcement Agency location prior to commencing the search of the items. Furthermore, said search may continue beyond the ten-day period beginning upon issuance of this Search Warrant, to the extent necessary to complete the search on the computer systems and any items listed above.

SONY0244

Any and all computer related items or documents containing the word Sony or containing known Sony product logo's; such as; labels, diskettes, CD-R's, CD-RW's, DVD's, envelopes, packaging materials, boxes, license agreements, holograms, certificates of authenticity, registration material, and instruction manuals.

Any and all equipment related to the production of counterfeit materials, such as; any computers, diskette copy machines, CD-Rom and DVD duplication equipment, shrink wrapping equipment, printing equipment, labeling equipment, and manufacturing supplies such as diskettes, CD-R's, CD-RW's, DVD's and CD-Rom cases, blank labels, plastic shrink wrap material, envelopes, and printing supplies.

Cash, checks, financial instruments, and other items of value that may be taken in exchange for the counterfeit merchandise.

Any financial documentation for the business "J.J. Electronics", "Ming Qi Zhang" whether in paper form or stored on computer media; such as, personal income tax records, business records, banking records, and sales, order or purchase records, and receipts.

All items, which may tend to identify other members of this on-going criminal enterprise, whether in paper form or stored on computer media; such as; phone bills, phone records, business cards, and books.

Any and all records, such as, invoices, checks, purchase orders, receipts, and bills of sale pertaining to the purchase and/or sale of any software product(s), whether stored on paper, on electronically readable or magnetic media such as tape, cassette, disk, diskette, or on memory storage devices such as optical disks, programmable instruments such as telephones, personal data assistants, electronic address books, calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records;

Any copies of software, supporting manuals, documents, certificates of authenticity and/or packing that contains a counterfeit mark at the time this Search Warrant is served;

Material commonly used on or in connection with the production, packaging and distribution of counterfeit software such as, labels,



SONY0245

stickers, boxes, holograms, certificates of authenticity, adhesive label certificates of authenticity, cartons, labeled and unlabeled compact disks, instruction manuals, whether intact or in the form of individual pages, "glass masters" and "metal stampers";

Any packaging material used on or in connection with suspected "bundling" of the counterfeit trademark software including shrink wrap machines, rolls of plastic wrap, heat guns, CD jewel cases, blank CDs, master CDs, colored inks, foil, silk screening supplies, photograph supplies, software slip covers and key code labels;

Machines commonly used as the means of production, sale, distribution or manufacture of counterfeit software such as, disk copy machines, silk screening machines, printing presses, embossers, wrapping machines, photography equipment, foil machines, hologram makers, computers, and/or printers;

Records related to the production, sale, distribution or manufacture of counterfeit software such as, records of sales, orders, purchases, storage, shipments, and payments for counterfeit software;

Records related to the purchase or acquisition of materials and equipment intended for as the means of production, sale, distribution, or manufacture of counterfeit software including printing supplies and equipment, packaging supplies and equipment, shipping supplies and equipment, manufacturing supplies and equipment, to include invoices, orders, packing slips, bills of lading, shipment receipts, bills, account statements, and correspondence;

Employee personnel records which show the names, addresses, telephone numbers, positions held and job responsibilities of current and past employees at the location where this Search Warrant is beings served and/or *J.J. Electronics*, who may have participated in or witnessed the production and/or sale(s) of counterfeit software;

Banking, business and financial records reflecting the location, distribution and flow of proceeds from the illegal production, sale, distribution, and manufacture of counterfeit software, including financial account information, account applications, account statements, account registers, locations of safe deposit records, sales tax records, income tax

SONY0246

records, payroll records, payroll tax records, wire transfer receipts, deposit slips, cancelled checks, money orders, cashier checks, bank statements, cash, correspondence, records that tend to show wire transfers or other movement of funds obtained in the trafficking of counterfeit software. Records that tend to show the movement and expenditure of funds for the purpose of concealing their true source or for the purpose of "laundering" illegally obtained proceeds of criminal activity, documentation-showing control of ownership of safety deposit boxes.

IT IS HEREBY ORDERED, that *Investigative Consultants* serve as the Substitute Custodian of Evidence that is seized pursuant to this Search Warrant at the specific request of the Orange County Sheriff's Department. The evidence / items seized during this Search Warrant shall remain available to the Orange County Sheriff's Department and the court of jurisdiction for whatever reason deemed necessary by said agency or court and remains bound by further orders of this court or court of jurisdiction.

All items seized pursuant to this Search Warrant shall be placed in a secure storage area, at a bonded warehouse approved by the Orange County Sheriff's Department. At the time of seizure and upon proper inventory of said seized items, exemplars may be removed and/or given for examination to representatives of member companies for authentication purposes. The exemplars will be returned to the evidence storage location when no longer needed for authentication, court, prosecution and/or defense purposes.

SONY0247